**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1665-17T3

THE ESTATE OF
ROBERT E. NOYES,

     Plaintiff-Respondent,

v.

RICHARD M. MORANO,
CYBER TECHNOLOGY, INC.,
and INDICES-PAC RESEARCH
CORP.,

     Defendants-Appellants.

_____

        Submitted July 17, 2018 – Decided  January 8, 2019

        Before Judges Ostrer and Vernoia.

        On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0179-15.

        Guarino & Co. Law Firm, LLC, attorneys for appellants (Philip L. Guarino, on the briefs).

        De Vita & Associates, attorneys for respondent (Richard D. De Vita, on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

Defendants Richard M. Morano and Morano's investment firms Cyber Technology, Inc. (Cyber) and Indices-Pac Research Corp. (IPR) appeal from an October 27, 2017 order denying their motion to compel arbitration pursuant to N.J.S.A. 2A:23B-7 and dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 4:6-2(a). We affirm.

I.

Robert Noyes was the owner and operator of a publishing company in Park Ridge. He died in March 2013. Plaintiff brings this action on behalf of his estate. Noyes met defendant Morano in 1990 when he leased commercial property to Morano. In October 1991, after Morano solicited Noyes for investment funds, they entered into a Purchase Agreement and a Shareholder Purchase Agreement.

Under the Purchase Agreement, Noyes agreed to purchase ten shares of Cyber, with Morano retaining ownership of the remaining ninety shares in the company. The Purchase Agreement provided in part that Noyes would purchase the shares "for the purpose of investment and not with a view to or for sale in connection with any distribution thereof." The accompanying Shareholder

Purchase Agreement included certain stock restrictions and provided that Noyes

may "acquire up to an additional ten . . . shares of stock in" Cyber, "subject to

the terms and conditions of [the] Agreement." Morano also "reserve[d] the right,

at [his] option and sole discretion, to convey up to forty . . . shares . . . of the

stock in . . . [Cyber] to investors without obtaining" Noyes's consent.

The Shareholder Purchase Agreement included the following arbitration

provision:

> A. In the event [of] any dispute [that] shall arise among the parties hereto as to any matter or thing covered hereby or as to the meaning or interpretation of this Agreement, the parties shall endeavor to resolve the dispute.
>
> B. In the event that the parties hereto are unable to resolve the dispute . . . within a period of thirty . . . days, such dispute shall be settled by an impartial board of three arbitrators located in Bergen County, New Jersey[,] using American Arbitration Association rules and procedures then prevailing in the State of New Jersey, which proceeding shall be final and binding. One arbitrator shall be chosen by each side to the dispute at their expense and in the event that only two . . . Shareholders remain as parties to this Agreement, another shall be chosen by the two . . . chosen arbitrators at the equal expense of the parties in dispute. In the event of a dispute in the payment of monies, any undisputed portion of the payment due shall be made based upon Article 3 as applicable, which payments shall begin no later than thirty . . . days after the date written notice of an arbitration filing is received by . . . [Cyber] or remaining Shareholders as applicable.

A-1665-17T3

> Payments shall be without prejudice to any party . . . .
> The first meeting of arbitrators shall occur within thirty
> . . . days of submission of the dispute to arbitration.

Noyes and Cyber also entered into a letter agreement dated October 29, 1991 ("the Cyber I agreement"), wherein Noyes granted Cyber $150,000 "to be invested in the stock market using any of the Trading Strategies selected by Cyber." The Cyber I agreement provided that "[t]he net profits (before taxes) realized from using the Trading Strategies will be distributed at the end of each calendar year[,]" with Noyes retaining fifty percent of the profits and Morano retaining the remaining fifty percent of the profits "to acquire additional shares of stock of Cyber . . . at a cost of $10,000 per share for a maximum of ten . . . shares." Paragraphs six and seven of the Purchase Agreement explicitly incorporated the Shareholder Purchase Agreement and the Cyber I agreement by reference.[1]

On August 11, 1993, Cyber and Noyes entered into a second letter agreement ("the Cyber II agreement"), wherein Noyes paid Cyber $100,000 to "invest primarily in stocks, stock index futures, and options on an unhedged basis."

---

[1] Defendants do not dispute that the arbitration provision in the Shareholder Purchase Agreement covered all disputes arising under that agreement, the Purchase Agreement and the Cyber I agreement.

A-1665-17T3

On February 20, 1997, Cyber and Noyes entered into a third agreement ("the Cyber III agreement"), wherein Noyes gave Cyber $200,000 to invest "exclusively" in Cyber's Trading Strategy on a fully hedged basis. Neither the Cyber II nor Cyber III agreements make any reference to the Purchase Agreement, the Shareholder Agreement, or the Cyber I agreement.[2]

In January 2015, plaintiff filed a complaint against Morano, Cyber and IPR alleging that in 1991 Morano, who "founded and ran" Cyber and IPR, solicited funds from Noyes "to be invested by Morano and his entities." The complaint alleged that Noyes agreed to provide the funds to Morano, which were "categorized as loans, stock purchases, loans converted to preferred stock, or funds for investing as securities" to open trading accounts in accordance with the Cyber I, Cyber II and Cyber III agreements. The complaint alleged Noyes and Morano entered into the agreements "with the understanding that those funds would be returned [to Noyes] with interest, and with a recordation or accounting of all funds paid."

---

[2] The Cyber III agreement is not included in the record on appeal. Our discussion of, and references to, the agreement are based on the trial court's written decision on defendant's motion to compel arbitration and dismiss the complaint. Plaintiff does not claim a violation of that agreement so its absence from the record is of no moment.

A-1665-17T3

According to the complaint, the funds paid in accordance with the Cyber I agreement "were to be invested in any of the trading strategies selected by . . . Cyber." The funds contributed pursuant to the Cyber II agreement were to be invested "primarily in stocks, stock index futures, and options on an unhedged basis," with defendants' compensation based on the annual return of the trading account. The Cyber III funds were to be invested "in stocks, with a percentage of profits going to both parties."

The complaint further alleged that "[u]pon information and belief, while most if not all of the loans were repaid, and the . . . [Cyber III] investment appears to have been returned . . . the first and second investments were neither returned nor accounted for, even with a few repeated requests."

Plaintiff asserted claims for breach of contract, unjust enrichment, misrepresentation, breach of fiduciary duty, negligence, conversion, and violations of the New Jersey Uniform Securities Act, N.J.S.A. 49:3-47 to -83, stemming from defendants' alleged failure to honor their agreement to return the invested principal in the Cyber I and Cyber II accounts to Noyes.

In February 2015, plaintiff filed an amended complaint, seeking an order compelling defendants' "[a]ccounting of all revenue and moneys owed[,] . . .

[a]warding compensatory damages[,] . . . [s]tatutory interest on all sums provided[,] . . . and [a]ttorneys' fees, filing fees, and costs."

Defendants filed a motion to dismiss on March 2, 2015, and it was subsequently denied on March 20, 2015. The matter was administratively dismissed on July 24, 2015, for lack of prosecution. On July 6, 2017, plaintiff filed a motion to restore the complaint, and the court granted its motion on August 21, 2017.

On September 26, 2017, defendants filed a motion to compel arbitration and to dismiss the action "for lack of subject matter jurisdiction pursuant to R. 4:6-2(a)." After hearing argument on the motion, the court entered an October 27, 2017 order denying defendants' motion to compel arbitration and dismiss the complaint.

The court determined the agreement was a consumer contract, because "Cyber investments and securities do not appear to be registered with either the New Jersey Bureau of Securities nor the United States Securities and Exchange Commission and defendants provide[d] nothing to the contrary," there was "no evidence . . . defendant Morano is a broker," and there was "no evidence that [Noyes] had any expertise or experience in the purchase of securities," but rather was "a publisher seeking to maximize returns on an investment."

A-1665-17T3

Relying on Atalese v. U.S. Legal Services Group, LP, 219 N.J. 430, 442-46 (2014), the court further determined Noyes was a consumer and entitled to a waiver-of-rights warning in the arbitration agreement stating that by signing the agreement, Noyes waived his constitutional or statutory right to "have [his] claims and defenses litigated in court." This appeal followed.

On appeal, defendants make the following argument:

ARGUMENT

POINT I

THE COURT BELOW ERRED IN DENYING ARBITRATION ON THE GROUND THAT NOYES AND MORANO WERE ENGAGED IN A CONSUMER TRANSACTION.

II.

Our review and interpretation of "the validity of an arbitration agreement, like any contract, is de novo." Morgan v. Sanford Brown Inst., 225 N.J. 289, 302 (2016) (citing Atalese, 219 N.J. at 446).

"'[A]rbitration . . . is a favored means of dispute resolution[,]' . . . [and] [i]t is well-settled that New Jersey's strong public policy favors settlement of disputes through arbitration." Curran v. Curran, 453 N.J. Super. 315, 320 (App. Div. 2018) (alterations in original) (quoting Minkowitz v. Israeli, 433 N.J. Super. 111, 131 (App. Div. 2013)). The Federal Arbitration Act, 9 U.S.C. §§ 1

to 16, places "arbitration agreements upon the same footing as other contracts," and "preempts state laws that single out and invalidate arbitration agreements." Roach v. BM Motoring, LLC, 228 N.J. 163, 173-74 (2017) (citation omitted). Thus, a court examines arbitration agreements like they would any contract under principles of contract law, and "a court 'cannot subject an arbitration agreement to more burdensome requirements than' other contractual provisions." Id. at 174 (quoting Atalese, 219 N.J. at 441).

In Atalese, our Supreme Court noted that "any contractual 'waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously' to its terms." Atalese, 219 N.J. at 443 (quoting Leodori v. Cigna Corp., 175 N.J. 293, 302 (2003)). The Court determined that "[a]rbitration clauses are not singled out for more burdensome treatment than other waiver-of-rights clauses under state law," id. at 444, but "when a contract contains a waiver of rights . . . the waiver 'must be clearly and unmistakably established,'" ibid. (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs, PA, 168 N.J. 124, 132 (2001)), and the clause "should clearly state its purpose," ibid. (quoting Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993)).

Although there are no specific set of words "necessary to accomplish a clear and unambiguous waiver of rights," ibid., the arbitration clause must, at a

minimum, include clear language indicating "that a consumer is choosing to arbitrate disputes rather than have them resolved in a court of law," ensuring the consumer has adequate notice that he or she is waiving their right to have their case adjudicated in a court of law, id. at 447. The Court invalidated the arbitration agreement at issue because it "did not clearly and unambiguously signal to [the] plaintiff that she was surrendering her right to pursue her statutory claims in court." Id. at 448.

In Morgan, the challenged arbitration agreement did not include a clause "explain[ing] that arbitration is a substitute for the right to seek relief in court – information necessary for the formation of a valid contract." 225 N.J. at 295. The Appellate Division previously reversed the trial court's denial of the defendants' motion to compel arbitration, holding "the arbitration agreement [was] sufficiently clear, unambiguously worded, and drawn in suitably broad language to provide plaintiffs with reasonable notice of the requirement to arbitrate all claims related to their enrollment agreements." Id. at 300. Our Supreme Court reversed, finding the arbitration agreement "suffer[ed] from the same flaw found in the arbitration provision in Atalese – it [did] not explain in some broad or general way that arbitration is a substitute for the right to seek relief in our court system," and was thus unenforceable. Id. at 307-08.

Here, defendants first argue that the Cyber I and II agreements were not consumer transactions subject to the holding in Atalese. The Consumer Contracts Act (the Act), otherwise commonly referred to as the "Plain Language Act," N.J.S.A. 56:12-1 to -13, defines a consumer contract as one that is "obtained for personal, family or household purposes," N.J.S.A. 56:12-1. Moreover, "[t]o qualify as a consumer transaction . . . the challenged services generally must be of the type sold to the general public." Finderne Mgmt. Co., v. Barrett, 402 N.J. Super. 546, 570 (App. Div. 2008).

The Act also provides that its definition of a consumer contract "does not include a written agreement involving a transaction in securities with a broker-dealer registered with the Securities and Exchange Commission." N.J.S.A. 56:12-1; see also Shelton v. Restaurant.com, Inc., 214 N.J. 419, 438 (2013) (applying the Act's definition of "consumer contract" to claims under the Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-14 to -18).

Here, Cyber does not assert, and the record does not show, that it is a "broker-dealer registered with the Securities and Exchange Commission." N.J.S.A. 56:12-1. Moreover, although the Shareholder Purchase Agreement provided for Noyes's purchase of Cyber stock, that is not the agreement plaintiff

asserts was violated. Plaintiff instead asserts the Cyber I agreement, in which Cyber agreed to provide investment services to Noyes, was violated.

The Cyber I agreement did not involve the sale of securities, but rather reflected only an exchange of money for services (i.e. Cyber's trading and investment services) for Noyes's personal financial benefit. We are convinced the Cyber I agreement is a consumer contract, and reject defendant's claim that the arbitration requirement is valid because it is contained in a purely commercial contract.[3]

Moreover, the arbitration provision does not clearly and unambiguously provide notice Noyes was waiving his right to bring his claims in a court of law. The arbitration agreement makes no mention of Noyes's waiver of his right to bring an action in a court of law, nor does it state that submission of disputes to arbitration means the parties will be deprived of their right to proceed in a court.

---

[3] We also note that even if we were to find the agreement was not a consumer transaction, we are not convinced that the Court in Atalese limited its holding only to consumer transactions. Indeed, in the years following the Court's decision in Atalese, our courts have also applied its holding to other contracts and statutory causes of action. See, e.g. Morgan v. Raymours Furniture Co., 443 N.J. Super. 338, 343 (App. Div. 2016) (applying Atalese to an employment contract); see also Dispenziere v. Kushner Cos., 438 N.J. Super. 11, 18 (App. Div. 2014) (noting that although Atalese involved different statutory causes of action, it cannot be read to limit its application only to those statutory claims).

Thus, the arbitration agreement did not conform to the waiver-of-rights requirements in Atalese and is unenforceable. Atalese, 219 N.J. at 443.

Defendants' argument that Noyes was a sophisticated business person and should have known that he would be waiving his right to a jury trial by signing the arbitration agreement has no merit. In Dispenziere, 438 N.J. Super. at 19, we explained that the plaintiff's "level of sophistication" or representation by counsel does not negate Atalese's requirement that a court find he "actually intended to waive his statutory rights," and "[a]n unambiguous writing is essential to that determination." Id. at 19-20 (quoting Garfinkel, 168 N.J. at 136). No such writing is present here.

## III.

In addition, the Cyber II agreement was never incorporated into the Purchase Agreement or otherwise made subject to the arbitration clause. In Alpert, Goldberg, Butler, Norton & Weiss, PC v. Quinn, we invalidated an alleged incorporated agreement, in part because there was no evidence that the "terms of the proposed incorporated document were known or assented to by [the] defendants," and because the "defendants were not shown and did not see the document until" several months after the initial agreement was signed. 410 N.J. Super. 510, 535 (App. Div. 2009). We outlined the principle of

13

incorporation by reference, noting that as "long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, no[n]-contemporaneous document." Id. at 533 (alteration in original) (quoting 4 Williston on Contracts § 30:25 (Lord ed. 1999)).

However, "in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." Ibid. (quoting 4 Williston on Contracts § 30:25 (Lord ed. 1999)).   We further held that in order to enforce a separate document under the principle of incorporation by reference, "the party to be bound by the terms must have had 'knowledge of and assented to the incorporated terms.'" Ibid. (citation omitted).

Here, there is no language in the Purchase Agreement, Shareholder Purchase Agreement, or Cyber I agreement either incorporating the Cyber II agreement or subjecting disputes arising under that agreement to arbitration. Indeed, the Cyber II agreement was signed on August 11, 1993, almost two years after the parties signed the Cyber I agreement.  The Cyber II agreement makes no reference to the Purchase Agreement, Shareholder Purchase Agreement or

the Cyber I agreement, other than stating it would "be bookkept separately from [the Cyber I account]." There is no evidence permitting a conclusion that the Cyber II agreement was incorporated into any of the prior agreements, and we therefore hold plaintiff has no obligation to arbitrate any claims arising under the Cyber II agreement.

Lastly, plaintiff argues we should dismiss defendants' appeal as untimely. Under Rule 2:4-1(a), an appeal from a final judgment "shall be taken within [forty-five] days of [its] entry." Plaintiff's argument ignores that under Rule 2:2-3(a)(3), an order "either compelling arbitration . . . or denying arbitration shall . . . be deemed a final judgment for appeal purposes." Defendants filed their notice of appeal forty-one days after the court's entry of the order denying their motion to compel arbitration. Defendants' filing was timely under Rule 2:4-1(a).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-1665-17T3